ACCEPTED
15-25-00078-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/5/2025 1:45 PM
CHRISTOPHER A. PRINE
CLERK

# NO. 15-25-00078-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/5/2025 1:45:01 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE FIFTEENTH COURT OF APPEALS
## AUSTIN, TEXAS

TRIDENT HOMES, INC. AND RYAN STRICKLAND,

*Appellants,*

v.

RAMESH KAINTHLA AND NEETU KAINTHLA.

*Appellees.*

On Appeal from the 272nd District Court, Brazos County, Texas
No. 21-000379-CV-272

## APPELLEES' BRIEF

| | |
|---|---|
| WATSON LAW FIRM | EWELL, BROWN, BLANKE & KNIGHT LLP |
| J. Davis Watson | Joseph R. Knight |
| State Bar No. 24004979 | State Bar No. 11601275 |
| dwatson@watsonlawyers.com | jknight@ebbklaw.com |
| Sean Hester | 111 Congress Ave., Suite 2800 |
| State Bar No. 00784266 | Austin, Texas 78701 |
| shester@watsonlawyers.com | (512) 770-4010 |
| 1450 Copperfield Pkwy, Suite 300 | |
| College Station, Texas 77845 | |
| (979) 703-4044 | |

**Attorneys for Appellees**
**Ramesh and Neetu Kainthla**

## IDENTITY OF PARTIES AND COUNSEL

In addition to the counsel identified in Appellant's Brief, the following is serving as lead appellate counsel for the Kainthlas:

> Ewell, BROWN, BLANKE & KNIGHT LLP
> Joseph R. Knight
> State Bar No. 11601275
> 111 Congress Avenue, 28th Floor
> Austin, Texas 78701
> (512) 770-4010
> jknight@ebbklaw.com

# TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................... i

Table of Contents ........................................................................................ ii

Table of Authorities ................................................................................... iv

Statement on Oral Argument ..................................................................... vi

Statement of Facts ........................................................................................1

Summary of the Argument ............................................................................9

Argument .....................................................................................................10

    I.      Legally and factually sufficient evidence supports the jury's explicit finding that Ryan Strickland was a party to the oral contract. ...............................................................................11

    II.    Legally and factually sufficient evidence supports the jury's damages findings. .......................................................................16

        A.    Legally and factually sufficient evidence supports the jury's award of $13,538.05. .......................................................16

        B.    Legally and factually sufficient evidence supports the jury's award of $3,802.23. .......................................................20

        C.    Legally and factually sufficient evidence supports the jury's award of $1,300. .........................................................22

    III.   The record supports the jury's rejection of Trident's claims. .............24

        A.    Appellants' argument is undermined by their mischaracterization of the October 22, 2020 billing packet. ....................................................................................24

        B.    Legally and factually sufficient evidence supports a finding that Strickland and Trident committed a prior material breach. ................................................................25

C. Appellants did not conclusively prove their claim, and the jury's failure to find in their favor is not against the great weight and preponderance of the evidence.................................29

IV. The trial court did not abuse its discretion in awarding attorney's fees.........................................................................................33

A. Appellants did not conclusively establish the affirmative defense of excessive demand. ...................................................34

B. The amount of attorney's fees awarded is not excessive merely because the jury awarded lower damages than the Kainthlas sought.............................................................................38

C. Proof of the Kainthlas' attorney's fees was adequately segregated.............................................................................43

Prayer ........................................................................................47

Certificate of Compliance ............................................................49

Certificate of Service ..................................................................49

# TABLE OF AUTHORITIES

## Cases

*Barker v. Eckman*,
213 S.W.3d 306 (Tex. 2006) ...................................................................41

*Burch v. Hancock*,
56 S.W.3d 257 (Tex. App.—Tyler 2001, no pet.)..................................15

*City of Fort Worth v. Zimlich*,
29 S.W.3d 62 (Tex. 2000) .....................................................................44

*City of Hous. v. Williams*,
353 S.W.3d 128 (Tex. 2011) ..................................................................19

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ................................................... 10, 11, 13

*Drummond v. WWW.URBAN.INC.*,
508 S.W.3d 657 (Tex. App.—Houston [1st Dist.] 2016, no pet.)................. 39, 40

*Findlay v. Cave*,
611 S.W.2d 57 (Tex. 1981) ................................................... 35, 38

*Gordon v. Leasman*,
365 S.W.3d 109 (Tex. App.—Houston [1st Dist.] 2011, no pet.)......................15

*Green Int'l v. Solis*,
951 S.W.2d 384 (Tex. 1997) ..................................................................33

*Hernandez v. Gulf Grp. Lloyds,*
875 S.W.2d 691 (Tex. 1994) ..................................................................26

*Hernandez v. Lautensack*,
201 S.W.3d 771 (Tex. App.—Fort Worth 2006, pet. denied)..............................35

*Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*,
295 S.W.3d 650 (Tex. 2009) ..................................................................39

*McMillin v. State Farm Lloyds*,
180 S.W.3d 183 (Tex. App.—Austin 2005, pet. denied)............................ 36, 37

*Metroplex Mailing Servs. v. RR Donnelley & Sons Co.*,
410 S.W.3d 889 (Tex. App.—Dallas 2013, no pet.)............................................42

*Mustang Pipeline Co. v. Driver Pipeline Co.,*
134 S.W.3d 195 (Tex. 2004) ............................................................26

*Panizo v. Young Men's Christian Ass'n of Greater Hous. Area*,
938 S.W.2d 163 (Tex. App.—Houston [1st Dist.] 1996, no pet.)........................37

*Posey v. Broughton Farm Co.*,
997 S.W.2d 829 (Tex. App.—Eastland 1999, pet. denied).................................15

*Rohrmoos Venture v. UTSW DVA Healthcare LLP*,
578 S.W.3d 469 (Tex. 2019) ............................................. 34, 40, 41, 43

*Safeshred, Inc. v. Martinez*,
365 S.W.3d 655 (Tex. 2012) ............................................................44

*Staff Indus., Inc. v. Hallmark Contracting, Inc.*,
846 S.W.2d 542 (Tex. App.—Corpus Christi 1993, no writ) ............................38

*State Farm Life Ins. Co. v. Beaston*,
907 S.W.2d 430 (Tex. 1995) ............................................................33

*Tony Gullo Motors I, L.P. v. Chapa*,
212 S.W.3d 299 (Tex. 2006) ................................................. 44, 45, 46

*Tuthill v. Sw. Pub. Serv. Co.*,
614 S.W.2d 205 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.) ........................36

*United Servs. Auto. Ass'n v. Hayes*,
507 S.W.3d 263 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) ................35

*Von Hoffman v. City of Quincy*,
71 U.S. 535 (1867) ............................................................19

**Statutes**

Tex. Civ. Prac. & Rem. Code § 38.001(b)(8)........................................34

Tex. Civ. Prac. & Rem. Code § 38.003 ............................................34

Tex. Prop Code § 162.001 ............................................................16

Tex. Prop. Code § 162.003(a)........................................................18

Tex. Prop. Code § 162.031 ............................................................19

## STATEMENT ON ORAL ARGUMENT

Appellants correctly suggest that oral argument is unnecessary. Their appeal merely second-guesses the jury's resolution of disputed fact issues and the trial court's discretionary award of attorney's fees to the prevailing parties. This Court likely does not need oral argument to assist in identifying the record evidence supporting the judgment under familiar and well-established standards. But of course, the Kainthlas will appear and argue if the Court prefers.

Ramesh and Neetu Kainthla are dissatisfied with Appellants' statement of facts, which is unhelpful to the Court because it exclusively presents Appellants' version of disputed facts that the jury resolved against them. Along the way, Appellants portray the Kainthlas as undeserving litigants merely because they saved enough money over thirty years to build a nice house, which Appellants pejoratively characterize as "sprawling" and "a mansion."

Plaintiff Neetu Kainthla and Defendant Ryan Strickland worked together for a long period of time, with Neetu often bringing him clients for whom he built custom homes. Appellants' Br. at 4; 8RR204. As a realtor, Neetu Kainthla has access to form contracts generated by the Texas Real Estate Commission, and she typically prepared written contracts for her clients, which Ryan Strickland would sign on behalf of his companies. 8RR205; 9RR54. But this relationship was different. The parties did not prepare a written contract.

The jury heard conflicting evidence regarding the terms of the oral contract and whether Strickland was a party to it. Yet Appellants unqualifiedly assert, "both parties agreed that the agreement was with Trident Homes." Appellants' Br. at 5. In fact, both Ramesh and Neetu Kainthla swore that they contracted personally with Ryan Strickland, not Trident. Ramesh testified: "my contract was with Ryan Strickland." 5RR131. He said the parties had no conversations whatsoever about

1

Trident Homes building the home. 5RR50. When Neetu was first asked whether she is "claiming that Ryan Strickland breached the contract," she likewise answered "[y]es, because we hired Ryan Strickland." 9RR53. She then gave the testimony that Appellants quote as if it were clear and uncontradicted. And then she clarified what she meant:

> Q:     So just want to be clear on this. You understand that the construction contract that we're here about was a contract between you and Trident Homes, right?
>
> A.     It was our house contract you're talking about, right?
>
> Q.     Yes, ma'am.
>
> A.     Our house contract when we hired him was with him. Whatever he told us, we did that. ***There was no written contract. It was a verbal agreement with him***.

9RR55 (emphasis added). The jury credited the Kainthlas' testimony and rejected Strickland's contention that he acted solely as an agent for his company. CR1226.

Appellants tell the Court that the construction project suffered "significant delays driven by Plaintiffs' failure to make timely selections," as if this, too, were undisputed. Appellants' Br. at 5. Neetu Kainthla testified extensively on this subject. She explained that when working with her clients in the past, Strickland would tell them when it was time to make selections, and he would accompany them to the relevant vendors. 8RR205-211. She expected to follow the same procedure here. *Id*. There was no agreement on any particular timetable for selections, yet she

2

never delayed when Strickland said it was time to make one. 8RR210-11. Likewise, Ramesh Kainthla testified that Strickland never discussed the timing of exterior selections, that the Kainthlas did not cause any delays, and that "we made the selections when we were told to make the selections." 5RR53, 147. Although Strickland said otherwise, he admitted that there is no documentary proof that he ever notified the Kainthlas that their selections had to be made by a particular date. 8RR163-64. The jury resolved the conflicting testimony in the Kainthlas' favor and expressly rejected Appellants' contention that the parties had agreed for selections to be made by particular times during the project's progression. CR1228 (Question 2(8)).

Appellants tell the Court that Trident funded the project "using the construction account it maintained." Appellants' Br. at 5. In fact, the "construction account" was a trust account established exclusively with the Kainthlas' money. 7RR225, 227. The Kainthlas initially deposited $30,100 into this account. 5RR54; 7RR227. Despite holding this sum in trust, Appellants sent monthly billing packets to the Kainthlas with every vendor invoice incurred that month. P.Ex.88 at 14RR130; 5RR58-67. Until the end of the parties' relationship, the Kainthlas timely paid every billing packet in full, adding 10% as the builders' fee. *Id*. Accordingly, the full amount of $30,100 should have remained in the construction account when Strickland terminated the contract in December 2020. But there was only

3

$13,538.05, and Appellants never accounted for the difference. 7RR181. Worse, they appropriated the remaining $13,538.05 for their own use and benefit before the litigation commenced. 7RR181-82; 8RR150-51. The jury found that this money belonged to the Kainthlas and that Appellants breached the parties' contract and knowingly violated the DTPA by taking it. CR1229-30; 1239-40; 1243-55; 1249-51.

Appellants state that in October 2020, they submitted a billing packet totaling $95,021.38 but "instead of paying the full amount, the Kainthlas remitted only $58,558.46." Appellants' Br. at 6. These assertions omit a critical, undisputed fact. Ramesh Kainthla complained that the original October 22, 2020 billing packet lacked the supporting documentation that the parties had agreed would be submitted with each request for payment. 6RR8-13. In response, Appellants *withdrew* the original October 22, 2020 billing packet and replaced it with a revised packet totaling $58,655.46. *Id*.; *see also* 7RR73-74 (Trident's bookkeeper testifying that he made a "correction" to the October 22 invoice that reduced the amount). Ramesh Kainthla paid the revised amount in full, along with an additional $5,865.55 builder fee. 6RR12. Appellants' own project spreadsheet reflects a charge of only $58,655.46 on October 22 and confirms that the charge was timely paid in full. P.Ex.88 at 14RR137.

The corrected and paid October 22, 2020 invoice included charges from a vendor called BMC in the amounts of $2,863.63, 768.58, and 83.83. P.Ex.88 at 14RR137. However, by letter dated November 12, 2020, BMC notified the Kainthlas that its invoices for $2,863.63, 768.58, and 83.83 had not been paid. P.Ex.100 at 14RR177. BMC threatened to place a lien on the Kainthlas' property. *Id*.

Ramesh Kainthla is a man who pays his bills. 5RR68-69. He told the jury that receiving a certified letter asserting an overdue debt and threatening a lien was hard on him. *Id*. Kainthla testified he confronted Strickland and demanded that Appellants satisfy BMC's claim with the money Kainthla had already paid them for these invoices. 5RR69. But Strickland flatly refused. *Id*.

Kainthla testified that it turned out BMC was not alone. There were other subcontractors that Appellants failed to pay even though they had collected money from Kainthla for the subcontractors' outstanding invoices. 5RR70-72. Kainthla said that he asked Strickland to sit down with him in person and reconcile the accounting between them so both parties could understand where all the money Kainthla had paid Strickland had gone. 5RR72. But Strickland refused to meet. 5RR73.

By this point, the Kainthlas had paid Appellants more than $1.8 million to cover vendor invoices and more than $180,000 in builder fees. P.Ex.88 at 14RR137.

5

Kainthla was reluctant to make further payments to Appellants until he and Strickland reconciled their accounting of funds because Kainthla was worried that if he paid Strickland, the funds would not be used to pay vendors on his project. 5RR73. Strickland responded that he was "tired of dealing" with the Kainthlas and would take them to court. 5RR74. Strickland announced that he would cut a check to himself from the funds that the Kainthlas had initially deposited with him and would sue the Kainthlas and anyone else who came to him looking for money. 5RR74; P.Ex.44 at 14RR30. Strickland threatened: "You have no idea how much this is about to cost you." *Id*.

Ramesh Kainthla then reviewed the various subcontractors' invoices and paid every vendor that Strickland had failed to pay. 5RR75-76. This included paying BMC the amounts Kainthla had previously paid Strickland for BMC's invoices—in other words, Kainthla paid these invoices twice. 5RR76.

Once the Kainthlas brought all of Appellants' subcontractors current on their billings, they started looking for ways to finish the work in Appellants' absence. 5RR76-78. One consequence of Appellants' mismanagement of the project was that several subcontractors quit mid job and refused to work for him. *Id*. For example, Appellants went through four electrical contractors without managing to complete the electrical work. *Id*. Ramesh Kainthla testified that persuading one of the original electrical vendors to come back and complete the work directly for the Kainthlas

resulted in significant additional costs. 5RR78. The Kainthlas sought to recover these extra expenses on their breach-of-contract claim, but the jury did not award damages on this element of the claim. CR1231. The Kainthlas spent approximately 9 more months managing various trades to complete their home and moved into it some four and a half years after Appellants started the project. 5RR78-79.

Meanwhile, in February 2021, the Kainthlas filed this lawsuit. CR7. Among other things, discovery revealed that Appellants repeatedly withdrew funds from the Kainthlas' construction trust account and used them for unrelated projects (sometimes later reimbursing the Kainthlas' account and claiming the transaction was an error). In April 2019, Appellants withdrew $23,048.35 from the Kainthlas' construction trust account without their knowledge or permission and used it to purchase an unrelated piece of property for a different Trident construction project. 5RR118-19; P.Ex.89 at 14RR142. Although this deduction was later repaid (also without the Kainthlas' knowledge), Ramesh Kainthla identified several deductions from his trust account for items that were not billed to him, did not relate to his project, and did not get repaid. 5RR121-24.

After hearing more than a week's worth of evidence, the jury returned a verdict finding, among other things, that:

- Both Trident Homes and Ryan Strickland were parties to the oral contract (CR1226);

- The contract included Appellants' promise to use funds in the Kainthlas' construction trust account only for their project (CR1227);

- The contract included Appellants' promise to timely pay all subcontractors and vendors (CR1228);

- Appellants failed to comply with the contract, causing over $28,000 in damages (CR1230-31);

- The Kainthlas did not fail to comply with the contract – "by excusal" (CR1232);

- Strickland intentionally, knowingly, or with intent to defraud, misapplied the Kainthlas' trust funds (CR1235-36);

- Appellants are holding money that belongs to the Kainthlas (CR1239-40);

- Appellants engaged in an unconscionable action or course of action that caused damages to the Kainthlas CR13243-44; 1249-50);

- They engaged in such conduct knowingly or intentionally (CR1245; 1251); and

- The Kainthlas were not unjustly enriched by Appellants and did not commit fraud against them (CR1256; 1258).

The Kainthlas elected to recover on their contract claim. By agreement, the parties tried the issue of attorney's fees to the court. After an evidentiary hearing on attorney's fees (12RR), the trial court rendered judgment that the Kainthlas recover $28,640.28 in damages, plus interest, and $233,769.83 in reasonable and necessary attorney's fees. CR1217-21. The judgment also awards appellate attorney's fees, contingent on success in this Court, which Appellants do not challenge. CR1220.

8

## SUMMARY OF THE ARGUMENT

This lawsuit arises out of an oral contract. At trial, the parties disputed the terms of this contract, including the identities of the contracting parties. Each side presented evidence in support of its positions on these disputed terms. The trial court submitted the disputed facts to the jury in a 44-page charge. And the jury sided with the Kainthlas on the terms that form the basis of the judgment.

To attack the verdict, Strickland and Trident do exactly what this Court cannot do. They cherry-pick the evidence on their side and mischaracterize or ignore evidence supporting the verdict. When the Court considers the evidence supporting the verdict, as it must in resolving Strickland's and Trident's no-evidence and great-weight points, it becomes clear that the jury simply found the Kainthlas' version of the facts more credible.

The trial court did not abuse its discretion by awarding attorney's fees calculated at a modest rate of $350 per hour and discounted significantly in Appellants' favor. Neither the facts nor Texas law supports Appellants' contention that the award is excessive merely because the Kainthlas demanded and sought to recover higher damages on their contract claim than the jury ultimately awarded.

The Kainthlas adequately segregated the fees they incurred. Because Appellants do not claim charge error, this Court reviews the evidence supporting the attorney's-fee award according to the charge as given. The jury found that the

misconduct on which the Kainthlas' tort claims were based also breached specific terms of the parties' oral contract. Accordingly, legal fees spent trying to prove this misconduct—which may have been unrecoverable in another case—were recoverable here because those fees were for legal work that also established the Kainthlas' claim for breach of contract.

The breach-of-contract question also instructed the jury to consider whether Appellants' behavior "comports with standards of good faith and fair dealing." Legal fees spent establishing Appellants' bad faith—which also may have been unrecoverable in other cases—were recoverable on the breach-of-contract claim here. The trial court therefore had adequate discretion to find, in light of the evidence and specific charge in this case, that the discounts given by the Kainthlas adequately segregated any small amount of fees that may have been incurred solely in connection with causes of action for which fees were not recoverable.

### ARGUMENT

While Appellants give a passing nod to the applicable standards of review (Appellants' Br. at 14), they fail to acknowledge just how steep a hill they must climb in this particular case. "If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The Court should reject Appellants' no-evidence and insufficient-evidence points.

## I.    Legally and factually sufficient evidence supports the jury's explicit finding that Ryan Strickland was a party to the oral contract.

Appellants lead with a little exaggeration.  They tell the Court three times—in their statement regarding oral argument, summary of the argument, and argument—that Neetu Kainthla conclusively admitted Strickland was not a party to the oral construction contract.  Appellants' Br. at 2, 12, 16.  There are at least three problems with this assertion.

First, a snippet of Neetu Kainthla's testimony would not be conclusive even if Appellants accurately represented it.  Plaintiff Ramesh Kainthla testified unequivocally that he believed and understood from the parties' discussions that Ryan Strickland was going to build the house for him.  5RR50; *see also* 5RR131 ("my contract was with Ryan Strickland").  He testified that the parties had no conversations whatsoever about Trident Homes or S&I Residential building the home.  5RR50.  The jury was free to credit this testimony, even if other evidence contradicted it.  *See City of Keller*, 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.  They may choose to believe one witness and disbelieve another.  Reviewing courts cannot impose their own opinions to the contrary.").

Second, Neetu Kainthla did not make the clear concession that Appellants claim.  Shortly before the testimony quoted in their brief, Neetu testified that she had a contract with Ryan Strickland:

11

> Q. Are you also claiming that Ryan Strickland breached the contract?
>
> A. Yes, because we hired Ryan Strickland.

9RR53. Neetu Kainthla then explained that when she dealt with Strickland's companies as a real estate agent, there was always a *written* contract between the company and the buyer. 9RR54. In the course of this examination, Appellants' counsel asked Neetu if she was "seriously" claiming that she had a "construction contract" with Ryan to build this house. *Id*. In context, her "no" answer indicated that, unlike the clients she represented in transactions with Strickland's businesses, she did not have a *written* contract with him to build her own home. In fact, when Appellants' counsel attempted to clear up the distinction, Mrs. Kainthla explained that she (a non-lawyer) was distinguishing between a contract and a verbal agreement:

> Q: So just want to be clear on this. You understand that the construction contract that we're here about was a contract between you and Trident Homes, right?
>
> A. It was our house contract you're talking about, right?
>
> Q. Yes, ma'am.
>
> A. Our house contract when we hired him was with him. Whatever he told us, we did that. ***There was no written contract. It was a verbal agreement with him***.

Q. But he was acting on behalf of Trident Homes, and you did not have a contract with him individually to build the house, correct?

A. ***We didn't have contract*** with -- ***we had a verbal agreement***, however you want to put it, but we had a contract with him and whatever his companies were.

9RR55 (emphasis added). At best, Neetu Kainthla's "concession" is ambiguous, not dispositive as Appellants contend. Appellants err by insisting the Court must credit the excerpt they quote from page 54 of Neetu Kainthla's testimony while disregarding what she said on pages 53 and 55. *See City of Keller*, 168 S.W.3d at 820 ("whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review").

Appellants' citation to volume 7 of the Reporter's Record is even worse. After telling the Court that Neetu Kainthla never considered using another builder, Appellants say: "***As she put it***, 'There was no doubt that Trident Homes would build this house.'" Appellants' Br. at 19 (citing 7RR201, emphasis added). Contrary to Appellants' representation, that is by no means "as she put it." The quoted testimony came from Ryan Strickland, not from Neetu Kainthla. 7RR201. The jury was free to disregard Strickland's self-serving assertion. It was well within the jury's discretion to accept the testimony of both Kainthlas that they negotiated and agreed to an oral contract with Strickland in an individual capacity.

13

Third, there is ample additional evidence corroborating the Kainthlas' testimony that they had an oral deal with Strickland personally. Strickland entered into this transaction with a level of informality that his companies would never implement, presenting a seven-figure construction bid sheet that did not even mention his companies' names. P.Ex.48 at 14RR31. Strickland never presented the Kainthlas with one of the standard written contracts that his businesses use, which would have called for a builder's fee of 20-22%. 8RR161. Strickland's willingness to build the Kainthlas' home for half his regular fee based on nothing more than a handshake shows Strickland's intent to undertake this project in an individual capacity based exclusively on his long-term personal friendship with Neetu Kainthla.

Appellants argue that Neetu Kainthla's familiarity with the contractual practices of Strickland's businesses in other transactions establishes that he was not individually a party to the contract here. But the evidence supports the opposite inference. In more than 40 prior transactions when one of Strickland's business entities was the contracting party, a written, fixed price contract was used. 8RR204-05. Had this transaction been the same, the parties could have executed a standard Trident Homes written contract. The fact that no such written contract exists in this unique situation supports the inference that this was not a typical contract with

14

Trident Homes. Rather it was, as the Kainthlas testified, an oral contract with Strickland himself based on personal trust.

Strickland's reliance on post-contract-formation activities cannot help him. Appellants' Br. at 19-20. Instructing the Kainthlas to write checks to Trident Homes and purchasing an insurance policy in the name of Trident Homes (which was not specific to this project) are irrelevant to the parties' intent at the time of contract formation. In *Gordon v. Leasman*, 365 S.W.3d 109, 115 (Tex. App.—Houston [1st Dist.] 2011, no pet.), for example, the court upheld a finding of personal liability despite proof that invoices were issued and checks were paid to the individual's business entity because the invoices and checks "do not relate to the time [the individuals] entered into the contract." *See also Burch v. Hancock*, 56 S.W.3d 257, 262 (Tex. App.—Tyler 2001, no pet.) (evidence was legally and factually sufficient to support finding that agent was individually liable even though plaintiff received check from the company); *Posey v. Broughton Farm Co.*, 997 S.W.2d 829, 832 (Tex. App.—Eastland 1999, pet. denied) (agent was personally liable on contract even though plaintiff subsequently received drafts with principal's name on them).

These cases are factually different from this one in the sense that the individual defendants did not disclose the existence of their principals during contract formation, whereas the Kainthlas already knew that Trident Homes existed. But there is no analytical difference because Strickland never disclosed that he was

entering into an oral contract solely on behalf of his business entity, and there is ample evidence that the Kainthlas never agreed to such an arrangement. The Court should overrule Appellants' first issue.

## II. Legally and factually sufficient evidence supports the jury's damages findings.

Appellants' analysis of the jury's findings regarding the Kainthlas' damages suffers a similar analytical flaw. Appellants urge the Court to credit their version of the facts over the Kainthlas' version without demonstrating why a rational jury *could not* have believed the Kainthlas.

### A. Legally and factually sufficient evidence supports the jury's award of $13,538.05.

Strickland testified that he maintained two bank accounts that are relevant to this case. First, there was a corporate operating account for Trident Homes, which held the company's own funds, from which Appellants could "spend our money on whatever we needed." 7RR225. The other account was created specifically for this project and called "the Kanati Cove account." *Id*. The money in this account did not belong to Strickland or his companies; rather, it "pays the bills for the house." *Id*. The Kainthlas initially deposited $30,100 into the Kanati Cove account. 7RR225, 227. By statute, Appellants held these funds in trust, and by Strickland's own admission, this money was to be used not on "whatever we needed," but solely to "pay the bills for the house." *Id*; Tex. Prop Code § 162.001.

16

Ramesh Kainthla identified the checks he wrote to fund the initial deposit into the Kanati Cove account and testified that that the account was "to be used for paying the bills incurred for 3545 Kanati Cove." 5RR55. Because the Kainthlas also paid for every construction expense incurred each month, the $30,100 deposit was intended to serve as a cushion in case expenses for the home needed to be paid before Strickland presented invoices and a draw request to the Kainthlas. 5RR166; *see also* 7RR227 (Strickland characterizing the funds as a "buffer"). Neetu Kainthla corroborated this testimony, confirming that the money in the trust fund was there only to allow Strickland to pay contractors if the Kainthlas were not available to provide funds for them on time. 8RR198-200. This testimony supports—and Appellants do not challenge—the jury's finding that Strickland and Trident agreed that they "would open a construction trust account and funds from that account would *only* be used to pay for the Kainthlas' construction project." CR1227 (emphasis added).

When Strickland terminated the parties' oral contract in December 2020, there was a balance of $13,538.05 in the Kanati Cove account. Rather than use this balance to pay contractors, as the parties agreed and the law requires, Appellants used it to pay themselves. 7RR181-82; 8RR150-51. Appellants cannot muster an argument that the trust funds in this account somehow belonged to them. The best they can argue is that the funds were not earmarked for "any specific unpaid vendor"

17

and that the Kainthlas failed to "offer testimony" that the use of these funds violated an "express term" of the parties' oral contract.  Appellants' Br. at 21-22.

These carefully chosen words come nowhere close to requiring reversal.  It was not the Kainthlas' burden to introduce "evidence that the funds were earmarked for any *specific* unpaid vendor, invoice, or project expense."  Appellants' Br. at 22 (emphasis added).  There were copious outstanding vendor invoices pending at the time Strickland terminated the contract.  P.Ex.88 at 14RR137; 5RR75-76.  These vendors were statutory beneficiaries of the trust funds in the Kanati Cove account.  Tex. Prop. Code § 162.003(a).  So were the Kainthlas.  Tex. Prop. Code § 162.003(b).  The Kainthlas' expert testified without objection or contradiction that it was improper for Appellants to appropriate these trust funds:

> Q. Did you see on this exhibit where Ryan Strickland took the money left in this trust account and put it into Trident operating account?
>
> A. I do.
>
> Q. What are your thoughts on that?
>
> A. That was not a proper thing to do.
>
> Q. Okay. Why not?
>
> A. The funds he did not earn, and all these funds in this account are supposed to go towards paying invoices for material and labor performed on this house. And this was probably part of that 30,000 cushion that was put in there. It's just not a proper thing to do, to take it out.

18

6RR170.  And it was not necessary for the Texas Construction Trust Fund Act to be an "express term" of the parties' contract.  "[I]t is 'settled that the laws which subsist at the time and place of the making of a contract . . . form a part of it, as if they were expressly referred to or incorporated in its terms.'" *City of Hous. v. Williams*, 353 S.W.3d 128, 141 (Tex. 2011) (quoting *Von Hoffman v. City of Quincy*, 71 U.S. 535, 550 (1867)).

When Appellants appropriated money from this account (7RR182; 8RR150-51), they broke the law and breached the contract.  Tex. Prop. Code § 162.031; CR1227, 1228.  In fact, Appellants do not even challenge the jury's findings that (1) Appellants held money that belongs to the Kainthlas; and (2) Appellants engaged in an "unconscionable action or course of action" by misusing the balance of the Kanati Cove account.  CR1239-40; 1243-44.

Appellants' attempt to justify their illegal conduct in this Court fall short.  They claim "Strickland testified that these funds were applied to actual overhead costs incurred in connection with the project."  Appellants' Br. at 22 (citing 7RR230-32).  But the cited testimony does not even mention the Kanati Cove account, much less trace funds from it to expenses incurred in connection with the project.  Likewise, Appellants tell the Court that certain fixed overhead expenses were "funded in part from the construction account."  Appellants' Br. at 22 (citing 7RR100-03).  But, again, the cited testimony does not even mention the Kanati Cove

19

account, much less conclusively establish a legitimate use of those funds in connection with the alleged overhead. *See, e.g.*, 7RR101 (discussing "insurance that wasn't specifically related to the Kainthlas' home").

More importantly, ample testimony and the jury's unchallenged finding (CR1227) establish that the parties agreed the Kanati Cove account was to be used *only* to pay for work on the home. Yet Appellants appropriated the balance of the Kanati Cove account for their own purposes. Because no one disputes that the balance of the account was $13,538.05 when the parties parted ways, the evidence is thus legally and factually sufficient to support the jury's award of this amount as damages for Strickland's and Trident's breach of contract.

### B. Legally and factually sufficient evidence supports the jury's award of $3,802.23.

The Kainthlas paid twice for $3,802.23 in charges submitted by two contractors (BMC and Madole Equipment Rental). Appellants argue that because Strickland never paid BMC or Madole in the first place, the vendors never "received duplicate reimbursement." Appellants' Br. at 23. But the concern is not whether the vendors *received* two payments. The concern is that the Kainthlas had to pay these vendor invoices twice, because Appellants misappropriated the first payments.

According to Appellants' own records, they submitted an invoice to the Kainthlas on October 22, 2020, in the total amount of $58,655.46. P.Ex.88 at 14RR137. Among the vendor charges comprising this amount were three invoices

20

from BMC totaling $3,721.04. *Id*. The Kainthlas paid the October 22 invoice in full on November 2, 2020, and at the same time they paid Appellants a builder fee of $5,865.55. *Id*. This payment was deposited into the Kanati Cove trust account on November 2, 2020. P.Ex.90-45 at 14RR159-60. This evidence indisputably shows that the Kainthlas paid Appellants for the three BMC charges totaling $3,721.04.

Nevertheless, by letter dated November 12, 2020, BMC threatened to place a lien on the Kainthlas' property because BMC had not received payment on its invoices for $3,721.04. P.Ex.100 at 14RR177. When Ramesh Kainthla asked Strickland to pay BMC, Strickland refused. P.Ex.1 at 14RR10; 5RR69. To prevent BMC from placing the lien on his property as threatened, Ramesh Kainthla then paid BMC directly by electronic funds transfer. 5RR76. Accordingly, he paid the BMC invoices twice—once to Appellants and once directly to BMC. *Id*.

The October 22, 2020 invoice that Kainthla paid to Appellants also included a charge from Madole Equipment Rental for $81.19. P.Ex.88 at 14RR136. As with the BMC payments, Appellants collected money from Kainthla to pay this invoice but failed to pay Madole. After paying Appellants for Madole's charge, Kainthla wound up paying it a second time to Madole by credit card. 5RR76. Adding the amount of this Madole charge to the amounts of BMC's bills, Kainthla paid a total of $3,802.23 to Appellants for the October 22, 2020 invoice that Kainthla wound up paying a second time directly to the vendors.

21

Kainthla's testimony that he paid Appellants for the BMC and Madole charges and then had to pay these amounts a second time directly to the vendors fully supports the jury's award of this sum to the Kainthlas. It also negates Appellants' contention that this double-payment amount was "introduced" by counsel during closing argument. Appellant's Br. at 23. Appellants offer no reason why the jury could not have credited this evidence, and this Court should reject their evidentiary challenges to the award.

## C. Legally and factually sufficient evidence supports the jury's award of $1,300.

Contrary to Appellants' argument, the jury heard conflicting evidence regarding minor damage to the Kainthlas' tile roof. Ramesh Kainthla testified unequivocally that certain roof tiles were cracked and had grass growing in them while Appellants were still on the job. 5RR105. He swore that Strickland told him not to worry about it because Strickland would have the roof inspected before the Kainthlas moved into the house, and any damage would be repaired at that time. *Id*. Kainthla further testified that when Appellants left the job, those tiles had not been repaired. 5RR105-06. He then had to pay the roofer $1,300 to repair those tiles because, by that time, the roof was out of warranty. 5RR106.

Appellants tell this Court that "Plaintiff Ramesh Kainthla admitted that Quick Roofing was contacted to address *new* cracking in the tiles." Appellants' Br. at 24 (emphasis added). This is false. In support of their representation, Appellants cite

22

8RR33-34, which is Strickland's testimony, not Kainthla's. Nothing on these two pages of Strickland's testimony could be twisted into an admission by Ramesh Kainthla that he paid $1,300 for repairs to "new cracking in the tiles" after Appellants left the job. 8RR33-34.

Strickland disputed Kainthla's version of the facts, testifying that that he saw only two broken tiles while he was still on the job, and he had the roofer repair those tiles before he paid the roofer's final installation bill. 7RR169. Strickland said that he did not know of any more broken tiles when he left the job. 7RR170; 8RR30. He speculated that the tiles that were later repaired for $1,300 were probably broken by someone walking on the roof after he left the job.

However, the Kainthlas' expert testified that, based on the location of the damaged tiles, there would not have been any reason for a person to have walked on them after Appellants left the job. 6RR128. Based on that fact, he assumed that the tiles were cracked during their initial installation and opined without objection that the builder would be responsible for the repairs. *Id*.; *see also* 6RR200-01 (admitting he does not *know* when the tiles were cracked but reiterating that "I could not see any reason anyone would have been working in an area that those tiles were broken").

This record required the jury to make a credibility decision regarding when the tiles cracked and who was responsible for the cost of repairing them. Yet again,

Appellants offer the Court no reason why a rational jury could not have believed Ramesh Kainthla and his expert and no reason why a jury was compelled to believe Strickland instead. The Court should reject this third and final evidentiary challenge to the jury's damages findings.

## III. The record supports the jury's rejection of Trident's claims.

There are multiple independent reasons why the Court should reject Trident Homes' contention that it conclusively proved its claims for breach of contract against the Kainthlas.

Appellants do not complain about the jury charge, which combined the question on Trident's claim with the instruction: "A failure to comply by the Kainthlas is excused if the Builder previously failed to comply with a material obligation of the same agreement." CR1232. Asked whether the Kainthlas breached the contract, the jury answered "No – By Excusal." *Id*. Accordingly, as they acknowledge (Br. at 26), to prevail here, Appellants must demonstrate that they conclusively proved both a material breach by the Kainthlas and that Appellants did not commit a prior material breach.

### A. Appellants' argument is undermined by their mischaracterization of the October 22, 2020 billing packet.

Appellants' entire argument regarding Trident's counterclaim is premised on their contention that Ramesh Kainthla underpaid the October 22, 2020 billing packet. Appellants' Br. at 6, 13, 27, 28, 30. But the record shows otherwise.

24

Appellants fail to tell the Court that the original October 22, 2020 billing packet in a total amount of $95,021.38 lacked the supporting documentation that the parties had agreed would be submitted with each request for payment. 6RR8-12. When Ramesh Kainthla pointed this out, Appellants *withdrew* the original October 22, 2020 billing packet and replaced it with a revised packet totaling $58,655.46. *Id*.; *see also* 7RR73-74 (Trident's bookkeeper testifying that he made a "correction" to the October 22 invoice that reduced the amount). Kainthla paid the revised amount in full, along with an additional $5,865.55 builder fee. 6RR12. This is why Appellants' own project spreadsheet reflects a charge of only $58,655.46 on October 22 and confirms that the charge was paid in full on November 2. P.Ex.88 at 14RR137.

Appellants can hardly establish as a matter of law that the Kainthlas were contractually obligated to pay an invoice that Appellants *withdrew and replaced*. They can hardly prevail as a matter of law on a claim that the Kainthlas underpaid the October 22 invoice when their own project records show the invoice was paid in full within 13 days. This Court should summarily overrule Appellants' third issue because it is built entirely on a false premise.

**B.      Legally and factually sufficient evidence supports a finding that Strickland and Trident committed a prior material breach.**

Appellants submitted the next billing packet on November 20, 2020 with $85,245.68 in new charges and an aggregate total of $111,709. 7RR79; PX88 at

25

14RR137. By that time, the parties were in dispute, and the Kainthlas did not pay the November 20 invoice to Strickland or Trident. *Id.* All of the amounts allegedly owed to Appellants as discussed in section III of their brief were charged on the November 20 invoice or later. Even if the jury believed the Kainthlas breached the contract, the jury could certainly have concluded that the breach occurred sometime after the Kainthlas received the November 20, 2020 billing packet.

It is a fundamental principle of contract law that "when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 196 (Tex. 2004) (citing *Hernandez v. Gulf Grp. Lloyds,* 875 S.W.2d 691, 692 (Tex. 1994)). The jury found in response to questions 1 and 3 that Trident was a party to the oral construction contract and that Trident (along with Strickland) breached the contract. CR1226, 1230. The jury also found that Trident (along with Strickland) agreed it "would open a construction trust account and funds from that account would only be used to pay for the Kainthla's construction project," and "would timely pay the sub-contractors and vendors for the work they performed on the home." CR1227, 1228. The jury also found that Appellants contracted to provide a $10,000 credit toward a refrigerator for the Kainthlas' home. CR1229. Appellants do not contest these findings. The record contains ample evidence that

26

Trident and Strickland breached these contractual terms before the Kainthlas allegedly breached the contract.

It is undisputed that in April 2019 Appellants withdrew $23,048.35 from the Kainthlas' construction trust account without their permission and used it to purchase an unrelated piece of property for a different Trident construction project. 5RR118-19; P.Ex.89 at 14RR142. Strickland admitted he withdrew these funds from the Kainthlas' trust account, and he characterized the withdrawal as an error. 7RR133. Strickland agreed that he effectively gave Trident an interest-free loan from the Kainthlas without their knowledge. 7RR136. Although Trident repaid these funds to the Kainthlas' account, Appellants did not come clean when they allegedly discovered their error. The Kainthlas did not learn of this misappropriation of their funds until they subpoenaed Appellants' bank records in connection with this case. 5RR118-19.

Appellants' records also showed other instances of using the trust funds in the Kainthlas' account for purposes unrelated to their project. Ramesh Kainthla identified the following deductions from his trust account for items that were not billed to him and did not relate to his project:

$1,051.16 to MidSouth Bank (P.Ex.89 at 14RR142);
$618.70 to Daniel Stagg (*Id*.);

$9,325.60 for a project at 4202 Wallaceshire (the same address for which the $22,000 "error" had previously been made) (*Id.*); and

$2,886 to College Station Utility for a permit on a different Trident project (P.Ex.88 at 14RR131).

5RR121-24.

It was well within the jury's province to find that Appellants were misusing the Kainthlas' trust fund over the course of many years—withdrawing funds when they needed them to cover expenses at unrelated projects. The evidence amply supports a finding that Strickland and Trident breached their contractual duty to use the funds in the Kainthlas' construction trust account *only* "to pay for the Kainthla's construction project." CR1227. All of these abuses occurred long before the Kainthlas allegedly breached the parties' contract. Because this evidence supports the jury's answer to question 5, the Court should overrule Appellants' third issue.

The jury also found that Appellants promised to provide the Kainthlas with a $10,000 credit toward the cost of their refrigerator, and Appellants breached this term of the contract. CR1229, 1231. Appellants do not challenge these findings. The jury heard evidence that Strickland denied this obligation and said he could not perform it back in May 2020. *See* P.Ex.138 at 14RR198-99; 5RR82-84. Then on November 11, 2020, when the parties were still trying to work together, Strickland flatly told the Kainthlas "I'm not paying money for the fridge." D.Ex.246 at 15RR233. Based on this evidence, the jury could have concluded that Appellants'

28

unchallenged breach of their contractual obligation to pay $10,000 toward the refrigerator occurred before the Kainthlas' alleged breach (which, again, logically could not have occurred before November 20, 2020).

The jury also could have found that, before the Kainthlas' alleged breach, Appellants breached their contractual obligation to "timely pay the sub-contractors and vendors for the work they performed on the home." In fact, it was Appellants' failure to pay BMC on time—despite receiving reimbursement from the Kainthlas for BMC's invoices—that led to the Kainthlas' refusal to accept Appellants' November 2020 invoice without first receiving an accounting of their funds. *See supra* at 20-22.

### C. Appellants did not conclusively prove their claim, and the jury's failure to find in their favor is not against the great weight and preponderance of the evidence.

The above-discussed proof of Appellants' prior breaches defeats their third issue. Alternatively, the Court should overrule the third issue because Appellants did not conclusively prove their claim in the first place, and the verdict is not against the great weight and preponderance of the evidence.

Appellants tell this Court that they "proved up builder fees totaling $19,425.22 that were earned but never paid." Appellants' Br. at 29. But the chart they provide often appears to have been created from the record in some other case. The Kainthlas

have reproduced Appellants' chart below with comments regarding their evidentiary citations:

|  | **Builder Fee Owed to Trident Homes** | **Proof** | **What the record citations really say** |
|---|---|---|---|
| Earthstone Colours | $287.91 | DX22; 7RR73-79 | Certain invoices are mentioned, but not in these amounts. And the right to payment is not established, but admittedly in dispute: "They were still trying to work some things out with him and Ryan." 7RR77. |
| Old Stone Marble and Granite | $1,705.61 | DX22; 7RR73-79 | |
| Art's Fencing | $738.30 | DX22; 7RR73-79 | |
| Emser Tile | $509.37 | DX22; 6RR15-16 | The charge is identified on DX22 and Kainthla admits that he received but did not pay an invoice for 7,389.83. No proof is cited regarding the legitimacy of the invoice or an amount owed to Appellants. |
| Frank Tello | $663.50 | DX20; PX90; 7RR94-95 | The cited testimony does not mention Frank Tello. |
| Additional Invoices Submitted to Kainthlas by Trident Homes | $3,733.48 | 7RR104-05; DX22 | The cited testimony does not mention any additional invoices submitted to Kainthlas, much less establish liability for any particular amount. |
| Subcontractors paid by Kainthlas outside of Trident Homes | $254.71 | 7RR104-05; DX22 | The cited testimony does not mention any subcontractors paid by Kainthlas outside of Trident Homes, much less establish liability for any particular amount. |
| Items purchased by Kainthlas | $1,450.01 | 7RR96-97; DX31 | DX31 does not appear in the record. The cited testimony does not quantify any particular |

30

| | | | |
|---|---|---|---|
| outside of Trident Homes | | | amount or value of items purchased outside of Trident Homes. |
| Gutters | $925 | 7RR95-96 | The cited testimony does not mention gutters. |
| Climate Doctors | $2,379.40 | 7RR96-97; DX 31 | DX31 does not appear in the record. The cited testimony does not mention Climate Doctors. |
| Cabinets – Juan Tzunun | $62.50 | DX22; 7RR95 | The cited testimony does not mention cabinets or Juan Tzunun. |
| Audio Video | $1,949.91 | 5RR96-97 | The cited testimony does not mention audio or video. |
| Art's Fencing (additional work and invoice) | $1,455.00 | DX22; 6RR8-16 | The cited testimony establishes that Art's Fencing initially requested a 50% payment, and Ramesh Kainthla paid the requested amount. He did not pay two later invoices 6RR13-14, 16. There is no proof that a builder's fee of over $1,400 was earned or owed. |
| Factory Builders | $3,094.33 | DX22; 6RR8-16 | The cited testimony does not mention Factory Builders. |

Appellants simply have not shown that they proved their case, much less that the jury lacked discretion to disbelieve it.

Moreover, Strickland admitted that more than half of the builder's fee Appellants claim is owed to them was calculated based on items that Appellants did not acquire for the home and never installed on the Kainthla home. 8RR150. Ramesh Kainthla testified that he bought certain items when Appellants could not or would not, and he told Strickland that he would provide purchase receipts and pay Appellants their 10% builder fee on these items as soon as Appellants installed them

on the house. 5RR79-82. It was well within the jury's discretion to find that Appellants had not earned a builders fee on items that the Kainthlas purchased and Appellants never installed.

There is no evidence that the Kainthlas ever failed to timely pay any invoice or associated builder fee from the beginning of the project in 2017 through and including the revised October 20, 2020 invoice that they paid on November 2, 2020. At that time, the Kainthlas had paid more than $1.8 million in contractor invoices and more than $180,000 in builder fees. PX88 at 14RR137. Afterwards, Appellants submitted only one more invoice in the aggregate amount of $111,709. *Id*. This November 20, 2020 invoice included all of the amounts that Appellants voluntarily removed from the original October 22 invoice, plus new charges. Even if—as Appellants allege—the Kainthlas breached the contract by not paying this November 20 invoice, the ten percent builder's fee associated with it would have been only approximately $11,171. The money that Appellants appropriated from the Kainthlas' construction trust account—net of the amounts the judgment returns to the Kainthlas—more than covered this alleged liability.

Appellants never accounted for the full amount of Kainthlas' $30,100 deposit into their construction trust account. The record showed that, prior to November 20, 2020, the Kainthlas had promptly paid in full every single invoice that Appellants submitted to them and, in each instance, added the 10% builder's fee. 7RR76. For

this reason, the balance in the Kainthlas' construction trust account in November 2020 should have been $30,100.

Yet the record shows that the balance in this account was only $13,538.05 in November 2020. 7RR181. The jury was free to conclude that Appellants had drained $16,561.95 from the Kainthlas' trust account by late November 2020, more than covering the Kainthlas' alleged liability for unpaid builder's fees and negating Appellants' claim for breach of contract.

Of course, we do not know the exact reason or reasons why the jury rejected Appellants' claim for breach of contract. The evidence permitted the jury to conclude that the Kainthlas did not breach the agreement or that any breach post-dated material breaches by Appellants. Either way, this Court should hold that Appellants did not conclusively prove their claim and that the verdict is not against the great weight and preponderance of the evidence.

## IV. The trial court did not abuse its discretion in awarding attorney's fees.

"To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Green Int'l v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) (citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 437 (Tex. 1995)). "[T]he the idea behind awarding attorney's fees in fee-shifting situations is to compensate the prevailing party generally for its reasonable losses resulting from the litigation process."

33

*Rohrmoos Venture v. UTSW DVA Healthcare LLP*, 578 S.W.3d 469, 487 (Tex. 2019).

The Kainthlas are entitled to an award of attorney's fees because they prevailed on their claim for breach of contract and recovered damages on that claim. Tex. Civ. Prac. & Rem. Code § 38.001(b)(8). The amount awarded in the judgment is the amount the Kainthlas actually incurred to litigate their case and is therefore the amount required to compensate them for their reasonable losses resulting from the litigation process.

This amount—$233,769.83—was based on the hours reasonably worked by capable, experienced lawyers multiplied by a modest rate of only $350 per hour and discounted by a total of more than $60,000. 14RR222-24. Appellants do not claim that the rate is unreasonable or that the amount of time spent on any task was unreasonable (except in the context of segregation). The trial court was entitled to take judicial notice of the usual and customary attorney's fees and the contents of the case file. Tex. Civ. Prac. & Rem. Code § 38.003; *see* 14RR222-25 (discussing, without contradiction the complexity and duration of the case). This Court should reject Appellants' three challenges to the attorney's-fee award.

## A. Appellants did not conclusively establish the affirmative defense of excessive demand.

Appellants initially challenge the presentment requirement on the Kainthlas' claim for attorney's fees, arguing that they should take nothing "as a matter of law"

because their pretrial demand was excessive. Appellants' Br. at 48. The Court should reject this argument for multiple reasons.

First, Appellants did not preserve this challenge for judicial review. "To preserve an excessive-demand challenge, a debtor is required to (1) plead excessive demand as an affirmative defense to the claim for attorney's fees and (2) request and obtain findings of fact regarding the essential elements of excessive demand." *United Servs. Auto. Ass'n v. Hayes*, 507 S.W.3d 263, 279 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd). Despite pleading 27 affirmative defenses, Appellants did not plead excessive demand. CR60-63. This defense has been waived.

Second, Appellants did not conclusively prove this defense. Even if the Kainthlas' pretrial demand of approximately $96,000 was unreasonably high—it was not, as shown below—that is insufficient to establish the defense. "[A]pplication of the excessive-demand doctrine is limited to situations in which a creditor has refused a tender of the amount 'actually due' or has clearly indicated to the debtor that such a tender would be refused." *United Servs. Auto. Ass'n*, 507 S.W.3d at 270; *Hernandez v. Lautensack*, 201 S.W.3d 771, 777-78 (Tex. App.—Fort Worth 2006, pet. denied); *see also Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981) (rejecting an excessive-demand defense because the defendant refused to offer the amount owed and "there has been no claim that [plaintiff] would have refused tender of the $ 5,624.23 the jury found owing to him"); *Tuthill v. Sw. Pub. Serv. Co.*,

614 S.W.2d 205, 212 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.) ("a demand is not 'excessive' unless . . . the creditor either refuses, or clearly indicates that he will refuse, tender of the amount actually due").

Here, Appellants never offered to pay the amounts awarded by the jury, and they introduced no evidence that the Kainthlas would have refused a tender of those amounts. To the contrary, Appellants initially threatened to sue the Kainthlas, and their consistent position was that the Kainthlas owed them money, not the other way around. 5RR74; P.Ex.44 at 14RR30. The complete absence of proof that Appellants would have paid a demand for the amount found owing defeats their unpleaded excessive-demand defense as a matter of law.

Finally, the evidence relevant to this unpleaded affirmative defense was contested, not conclusive. Appellants argue that the demand was unreasonable because it was "nearly four times the amount the jury ultimately awarded." Appellants' Br. at 47. The court rejected an identical argument on stronger facts in *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 209 (Tex. App.—Austin 2005, pet. denied). There, the plaintiffs made a pretrial demand of $950,000, yet recovered only $1,000 at trial. Like Appellants here, State Farm argued that the plaintiffs could not recover attorney's fees due to their demand being excessive and "point[ed] to the judgment as showing that the demand was unreasonable." *Id*. Rejecting this argument, the court explained that "the size of the verdict does not prove that the

36

[plaintiffs] would not have taken a lesser amount to settle the dispute, nor does it prove as a matter of law that the [plaintiffs'] demand was unreasonable." *Id*. The same is true here. *See also Panizo v. Young Men's Christian Ass'n of Greater Hous. Area*, 938 S.W.2d 163, 169 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (unliquidated demand of $125,000 not excessive even though jury awarded only $1,000).

Appellants also contend that Ramesh Kainthla "conceded under oath that the $95,955.46 demand was 'not reasonable.'" Appellants' Br. at 47. As shown in the testimony set forth in their brief, however, this concession was expressly tied to the amount of money Trident Homes allegedly had in its checking account at the time of the demand. *Id*. at 47-48 (quoting 6RR80-81). The trial court was not bound to accept this testimony as a concession that the demand was an unreasonable estimate of the Kainthlas' damages. The court could reasonably have interpreted Ramesh Kainthla's testimony as merely agreeing it was not reasonable to expect Trident to pay more than $95,000 "at that time" (6RR80-81) because Trident did not have the funds available in the referenced checking account "at that time."

Regardless, Kainthla's testimony is not the only relevant evidence the trial court heard on this topic. As aptly summarized in Appellants' brief, the Kainthlas sought recovery for itemized losses that totaled considerably more than the pre-suit demand. *See* Appellants' Br. at 50-53. They introduced a damages model totaling

over $319,000. D.Ex.390 at 15RR310-13. This is evidence that the Kainthlas had a good-faith basis for claiming the amount they demanded. *See, e.g.*, *Staff Indus., Inc. v. Hallmark Contracting, Inc.*, 846 S.W.2d 542, 548 (Tex. App.—Corpus Christi 1993, no writ) ("absent some evidence of unreasonableness or bad faith, a demand is not excessive merely because it is greater than that which is later determined at trial to be due") (citing *Findlay*, 611 S.W.2d at 58).

Having admitted evidence of claimed damages in excess of three times the Kainthlas' demand, the trial court had an ample basis for rejecting any claim of excessive demand. Even though the jury exercised its prerogative not to award the full amount of these claimed damages, the Kainthlas' proof is evidence the trial court could have considered in determining that their pre-suit demand was not excessive.

**B.** **The amount of attorney's fees awarded is not excessive merely because the jury awarded lower damages than the Kainthlas sought.**

Relatedly, Appellants assert that the attorney's-fee award is not supported by legally or factually sufficient evidence. Appellant's Br. at 49. But they do not back this contention with any analysis of the record evidence or any reference to the standards governing such contentions. Rather, they superficially argue that the award is excessive because it is disproportionate to the amount of damages the Kainthlas recovered. *Id*. at 49-53. Appellants cite a total of three cases, none of which supports this contention.

38

The issue in *Intercontinental Group* was whether the plaintiff constituted a "prevailing party" under a contract. KB Home obtained a verdict on its claim for breach of contract, but the jury awarded no damages. The Supreme Court held that because KB Home recovered no damages on its claim for breach of contract, it could not be considered to have "prevailed" on that claim. "Whether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009). "The jury answered '0' on damages, and KB Home sought no other type of relief, so the trial court should have rendered a take-nothing judgment against KB Home on its contract claim." *Id.* "A zero on damages necessarily zeroes out 'prevailing party' status for KB Home." *Id.* at 655-66. Because the Kainthlas were awarded money on their breach-of-contract claim, *Intercontinental Group* is irrelevant here.

The issue in *Drummond* was whether the defendant was a prevailing party under a contract. Urban sued Drummond for breach of the parties' agreement. Although the jury found that both parties breached, it found that Urban breached first, which meant that Drummond's breach was excused as a matter of law. *Drummond v. WWW.URBAN.INC.*, 508 S.W.3d 657, 671 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Based on the verdict, the trial court rendered judgment that Urban take nothing on its claim for breach of contract. Having defeated Urban's

39

claim, the court of appeals held that Drummond was the "prevailing party" under the contract and was therefore entitled to recover attorney's fees: "Drummond prevailed at trial by successfully defending against the main issue in this case, i.e., Urban's breach of contract claim." *Id*. at 669. Because the Kainthlas do not seek attorney's fees as prevailing defendants, *Drummond* has nothing to do with this case.

The only other case cited by Appellants in this section of their brief is the Supreme Court's leading opinion on attorney's fees, *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019). Appellants concede that *Rohrmoos* requires a trial court to calculate a lode star when considering an award of attorney's fees—the number of hours reasonably expended multiplied by a reasonable rate for the work. Appellants' Br. at 49. In fact, *Rohrmoos* establishes that this product yields a "presumptively reasonable" fee. *Id*. at 496.

Appellants then state that "the court may adjust the lodestar—up or down— based on specific factors, with the most important factor being the result obtained." Appellants' Br. at 49 (citing *Rohrmoos*). Even if this were a correct reading of *Rohrmoos*, it would not help Appellants because they are arguing that the court ***must*** adjust the lodestar, not that it "***may***" do so. More importantly, Appellants misread *Rohrmoos*. Nothing in *Rohrmoos* suggests that "results obtained" is the most important factor to be considered in adjusting a lodestar. To the contrary, the Court explained that "results obtained" is usually subsumed in the lodestar itself:

> In Texas courts, the base lodestar calculation of reasonable hours times a reasonable rate should account for any results obtained up to trial. But to the extent that the results obtained are not reflected in the base lodestar, then the fact finder may determine whether the results obtained consideration necessitates an adjustment to achieve a reasonable fee under the second step of the lodestar method. *Cf. Barker v. Eckman*, 213 S.W.3d 306, 313–14 (Tex. 2006).

*Rohrmoos*, 578 S.W.3d at 500 n.12. *Barker* illustrates a unique circumstance when "results obtained" would not already be baked into the lodestar determination. There, a jury awarded damages of approximately $111,000, and the jury was instructed to consider this result in fashioning an award of attorney's fees. The court of appeals reduced the damages award down to $16,000 and then ordered a new trial on attorney's fees based on this post-trial adjustment of the damages award. *Barker*, 213 S.W.3d at 313–14. The Court could not determine whether the attorney's-fee award should stand or not because it did not know how much weight the jury gave the "results obtained" factor. *Id*. at 314. Neither *Barker* nor *Rohrmoos* in any way suggests that an appellate court should use "results obtained" to reduce a trial court's award of attorney's fees when the actual damages are not adjusted.

In fact, Appellants cite a grand total of zero cases in which any appellate court has reversed an award of attorney's fees based on its assessment that the award is disproportionate to the results obtained. Texas courts require an award of attorney's

41

fees to be reasonably proportionate to the amount in controversy, not to the final amount awarded.

The applicable rules are discussed in *Metroplex Mailing Servs. v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 894 (Tex. App.—Dallas 2013, no pet.), which rejected an argument identical to Appellants' argument. Donnelley recovered a judgment against Metroplex for $40,391.28 in actual damages and $538,358.32 in attorney's fees. This ratio of more than 13:1 significantly exceeds the 8:1 ratio we have here. The court's analysis is squarely on point:

> Metroplex and Marion do not challenge the evidence supporting the award *per se* in their request for remittitur, but argue only that the award of attorney's fees is disproportionate to the award of damages. While attorney's fees should bear some reasonable relationship to the amount in controversy, there is no rule that fees cannot be more than the actual damages awarded. Indeed, the amount awarded for attorney's fees can greatly exceed the amount of damages recovered. In this case, the legal issues involved claims and counterclaims with damages sought totaling more than $3 million. Donnelley submitted detailed invoices itemizing the majority of the work performed and there is no evidence that the rate charged by Donnelley's attorneys was unreasonable. Based on the record before us, we conclude the evidence is factually sufficient to support the award and we decline to suggest a remittitur.

*Metroplex Mailing Servs*, 410 S.W.3d at 900-01 (multiple citations omitted).

Likewise, this case was complex, with claims and counterclaims necessitating a 44-page jury charge. The Kainthlas submitted detailed invoices itemizing the work

performed by their lawyers. 14RR221-292. Appellants do not contend that the hours expended or the rates charged were unreasonable. The mere fact that the jury awarded less damages than the Kainthlas sought does not undermine their right to recover the reasonable and necessary fees they incurred to prosecute the case. *See Rohrmoos*, 578 S.W.3d at 487 ("the idea behind awarding attorney's fees in fee-shifting situations is to compensate the prevailing party generally for its reasonable losses resulting from the litigation process"). This Court should reject Appellants' excessiveness argument.

## C. Proof of the Kainthlas' attorney's fees was adequately segregated.

Finally, the Court should reject Appellants' challenge that the Kainthlas "failed to segregate." Appellants' Br. at 53. This argument is primarily a repackaged version of their complaint that the attorney's fees are excessive in light of the actual damages recovered. Appellants argue that the Kainthlas should have segregated the time spent on the damages elements for which they recovered and should not be allowed to recover for time spent pursuing damages elements that the jury did not award. *See* Appellants' Br. at 55-56. No case requires this sort of segregation.

The Kainthlas admittedly pled and submitted to the jury causes of action for which attorney's fees were recoverable and causes of action for which they were not recoverable. In this case more than most, however, not only were the facts underlying each claim intertwined, but so were the legal elements and hence the time

spent trying to prove them.  The vast majority of the legal services performed in this case "advance[d] both a recoverable and unrecoverable claim," rendering them "so intertwined that they need not be segregated." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006).

Because Appellants do not claim charge error, the Court evaluates the evidence "in light of the charge as given." *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 661 n.3 (Tex. 2012); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).  Several aspects of the jury charge in this case establish a broader than usual overlap between the tort claims and the contract claims.

For example, the jury found that the parties' contract included a term that Appellants "would open a construction trust account and funds from that account would only be used to pay for the Kainthlas' construction project." CR1227.  Work performed by the Kainthlas' lawyers to prove that Appellants breached this contractual provision simultaneously advanced their claims for violation of the Texas Construction Trust Act, violation of the DTPA, fraud, money had and received, and breach of fiduciary duty, all of which were based on the same conduct.  Recovery of fees for the hours spent proving that Appellants misused the trust funds is "not disallowed simply because they do double service." *Tony Gullo*, 212 S.W.3d at 313.

44

Likewise, Appellants had a contractual obligation to "timely pay the sub-contractors and vendors for the work they performed on the house." CR1228. Evidence admitted at trial established that Appellants breached this duty by sometimes keeping for themselves money that the Kainthlas had already paid them for the purpose of paying subcontractors. The legal work spent proving a violation of this contractual term simultaneously supported the Kainthlas' claims for fraud, violation of the DTPA, money had and received, and breach of fiduciary duty.

Further still, in connection the claim for breach of contract, the jury was instructed to consider "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." CR1230. Fees incurred for legal work aimed at proving that Appellants acted fraudulently, unconscionably, in violation of their fiduciary duties, and in violation of the Texas Construction Fund Act were recoverable in this case because they helped establish Appellants' lack of good faith and fair dealing and therefore helped establish the claim for breach of contract.

The trial court could reasonably have concluded, based on the unique facts of this case and the specific charge to the jury, that little or none of the fees charged by the Kainthlas' lawyers "relate solely to a claim for which such fees are unrecoverable." *Tony Gullo*, 212 S.W.3d at 313. The court also heard undisputed evidence that the Kainthlas' lawyers wrote off $50,000 worth of their time and thus

discounted their claim against Appellants by that amount. 14RR223; 12RR100. On top of that, the Kainthlas deducted an additional 5% to account for the small amount of fees that were possibly incurred on tasks that related solely to claims for which attorney's fees were unrecoverable. 14RR224; 12RR100-01.

Appellants criticize this 5% estimate as "conclusory." But the Supreme Court anticipated and rejected this attack. The Court recognized that "many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other." *Id*. Accordingly, the Court advised lawyers to segregate their fees exactly the way the Kainthlas lawyers did here. They "did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of [the Kainthlas'] petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim." *Id*. at 314. The evidence produced in this case—time records accompanied by testimony from the Kainthlas' lawyer—is legally and factually sufficient under *Tony Gullo* to support the trial court's fee award.

The contrary testimony of Appellants' counsel does not require reversal of the award. They argue that "the overwhelming majority of the case was devoted to claims on which Plaintiffs did not prevail," citing as an example the Kainthlas' claim for extra costs associated with the electrical work. Appellants' Br. at 55. But the Kainthlas unquestionably pursued recovery of these costs as an element of their

damages for breach of contract. CR1231. The fact that the jury awarded $0 on this element of the Kainthlas' claimed contract damages does not raise a segregation issue. Appellants cite no authority for the proposition that a prevailing plaintiff must segregate out fees spent trying to prove elements of contract damages that a jury declines to award.

Finally, Appellants posit that "Plaintiffs' own fee invoices, attached to their affidavit (Exhibit T), show a heavy focus on discovery, depositions, and motions practice relating to claims for which fees are not recoverable." Appellants' Br. at 56. But Appellants do not discuss this evidence in any meaningful way. They do not challenge a single time entry. They do not identify a single witness whose deposition would not have been taken, a single discovery request that would not have been served, or a single motion that would not have been filed, if the Kainthlas had asserted only their claim for breach of contract (which, again, required them to negate Appellants' good faith). Appellants thus utterly fail to carry their appellate burden of establishing that the totality of evidence considered by the trial court was factually insufficient to support an award of attorney's fees constituting the amount the Kainthlas incurred, less $50,000, less 5%.

## PRAYER

The Kainthlas pray that the Court affirm the judgment of the trial court and award them such further relief to which they may be entitled.

47

Respectfully submitted,

Ewell, Brown, Blanke & Knight LLP

By: */s/ Joseph R. Knight*
Joseph R. Knight
State Bar No. 11601275
jknight@ebbklaw.com
111 Congress Avenue, Suite 2800
Austin, Texas 78701
(512) 770-4010


Watson Law Firm
J. Davis Watson
State Bar No. 24004979
dwatson@watsonlawyers.com
Sean Hester
State Bar No. 00784266
shester@watsonlawyers.com
1450 Copperfield Pkwy, Suite 300
College Station, Texas 77845
(979) 703-4044

*Attorneys for Appellees*

**CERTIFICATE OF COMPLIANCE**

As required by Texas Rule of Appellate Produce 9.4(i)(3), I certify that this Appellees' Brief contains 11,094 words, excluding the parts of the brief exempted by Rule 9.4(i).

/s/ *Joseph R. Knight*
Joseph R. Knight

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this Brief has been served upon the following via electronic mail on the 5th day of December 2025.

Chad Flores
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002

Matthew D. Sharpe
matt.sharpe@lonestarlawoffice.com
Sharpe Law, PC
416 Tarrow St
College Station, Texas 77840

Mark Hellinger
mhellinger@hellingerlawfirm.com
The Hellinger Law Firm
12 Greenway Plaza, Suite 1100
Houston, TX 77046-1201

/s / *Joseph R. Knight*
Joseph R. Knight

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 108777694
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellees' Brief
Status as of 12/5/2025 1:55 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark Hellinger | | mhellinger@hellingerlawfirm.com | 12/5/2025 1:45:01 PM | SENT |
| Matthew D.Sharpe | | matt.sharpe@lonestarlawoffice.com | 12/5/2025 1:45:01 PM | SENT |
| Charles Flores | | cf@chadflores.law | 12/5/2025 1:45:01 PM | SENT |
| Charles Flores | | cf@chadflores.law | 12/5/2025 1:45:01 PM | SENT |
| J. Davis Watson | | dwatson@watsonlawyers.com | 12/5/2025 1:45:01 PM | SENT |
| Sean Hester | | shester@watsonlawyers.com | 12/5/2025 1:45:01 PM | SENT |